# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

NIKOLAY KRECHET

:  Hon. William H. Walls

:  Crim. No. 17-221 (WHW)

:

:

---

# MEMORANDUM OF THE UNITED STATES
# OF AMERICA IN OPPOSITION TO DEFENDANT'S
# PRE-TRIAL MOTIONS

---

WILLIAM E. FITZPATRICK
Acting United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
(973) 645-2742

On the Memorandum:

Andrew J. Bruck
David W. Feder
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES..................................................................... iii

BACKGROUND ................................................................................... 1

ARGUMENT ....................................................................................... 2

I.    The Government Will Not Introduce Krechet's Uncounseled Statement
      in Its Case-In-Chief But Seeks Leave to Introduce It For Impeachment
      Purposes. (Response to Motion 1, KB5-10). ........................................ 2

II.   The Court Should Deny Without a Hearing the Motion to Suppress
      Evidence Seized from the Hotel Room Because the Agents Clearly Had
      Valid Consent to Search It. (Response to Motion 2, KB10-12). ................ 3

III.  Krechet Fails to Make the Requisite Substantial Preliminary Showing to
      Trigger a Hearing on the Validity of the Complaint and Search Warrant
      Affidavit. (Response to Motions 3 and 4, KB12-22). .............................. 8

      A.    Legal Standard ............................................................... 9

      B.    Krechet Fails to Demonstrate That the Affiant Made Intentional
            or Reckless Omissions, or That the Omissions Were Material. .... 12

      C.    In the Alternative, the Post-Arrest Statement Was Properly
            Obtained. ..................................................................... 19

IV.   The "Outrageous Government Conduct" Doctrine, If It Even Exists, Is
      Inapplicable Here. (Response to Motion 5, KB22-26) ........................... 23

V.    Krechet Is Not Entitled to a Pretrial Hearing on Potential Co-
      Conspirator Statements. (Response to Motion 6, KB26-28)................... 30

VI.   Krechet's Baseless Motion About the Government's Proof That He
      Transacted in Fraudulently Obtained Gift Cards Should Be Denied.
      (Response to Motion 7, KB28-30). ..................................................... 32

VII.  Krechet's Blanket Authenticity and Chain of Custody Challenges Are
      Premature and Do Not Conform to the Court's Order. (Response to
      Motions 8 and 9, KB30-31). ............................................................. 34

VIII.   A *Starks* Hearing Is Unwarranted Because Krechet Has Not Made a
        Colorable Attack on the Authenticity or Accuracy of Any Recording.
        (Response to Motion 10, KB31-32). ...................................................... 34

IX.     Krechet's Motion That the United States Preserve Its "Rough Notes,"
        "Report Drafts," and "Final Reports" Is Moot, Because the United
        States Has and Will Continue to Preserve Such Documents.
        (Response to Motion 11, KB32-33). ...................................................... 36

X.      Krechet's Request for Jencks Disclosures Is Mooted by the Scheduling
        Order. (Response to Motion 12, KB33-34). .......................................... 37

XI.     Krechet's Request for Transcripts of Recorded Conversations Ten
        Days Before Trial Should Be Rejected. (Response to Motion 13, KB34).  38

XII.    Krechet's Request for the Identification of and a Pretrial Hearing on
        Rule 404(b) Evidence Is Premature. (Response to Motion 14, KB34-35). 39

XIII.   Krechet May Make Additional Motions Based on Information Unknown
        to Him Prior to the Deadline Previously Established by This Court.
        (Response to Motion 15, KB35-36). ...................................................... 40

CONCLUSION ............................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**

*Bourjaily v. United States,*
 483 U.S. 171 (1987) ................................................................ 30, 31

*Brown v. Illinois,*
 422 U.S. 590 (1975) ................................................................ 20, 23

*United States v. Caruso,*
 948 F. Supp. 382 (D.N.J. 1996) ................................................... 33

*Dunaway v. New York,*
 442 U.S. 200 (1979) ....................................................................... 23

*Franks v. Delaware,*
 438 U.S. 154 (1978) ................................................... 9, 10, 11, 12

*Hudson v. Michigan,*
 547 U.S. 586 (2006) ....................................................................... 20

*Illinois v. Gates,*
 462 U.S. 213 (1983) ....................................................................... 15

*Illinois v. Rodriguez,*
 497 U.S. 177 (1990) ......................................................................... 5

*Jenkins v. Leonardo,*
 991 F.2d 1033 (2d Cir. 1993)......................................................... 2

*Kansas v. Ventris,*
 556 U.S. 586 (2009) ......................................................................... 3

*Kaupp v. Texas,*
 538 U.S. 626 (2003) ....................................................................... 21

*Massiah v. United States,*
 377 U.S. 201 (1964) ......................................................................... 3

*New York v. Harris,*
 495 U.S. 14 (1990) ......................................................................... 19

*Paff v. Kaltenbach,*
 204 F.3d 425 (3d Cir. 2000)......................................................... 15

*Rawlings v. Kentucky,*
    448 U.S. 98 (1980) .............................................................. 21, 22

*Taylor v. Alabama,*
    457 U.S. 687 (1982) ............................................................ 22, 23

*United States v. Ammar,*
    714 F.2d 238 (3d Cir. 1983)................................................. 31, 36

*United States v. Atwell,*
    Crim. No. 13-560, 2015 WL 2092687 (D.N.J. May 5, 2015)........................ 33

*United States v. Barbosa,*
    271 F.3d 438 (3d Cir. 2001).................................................. 24

*United States v. Beverly,*
    723 F.2d 11 (3d Cir.1983) .......................................... 25, 28, 29

*United States v. Bobb,*
    471 F.3d 491 (3d Cir. 2006).................................................. 30

*United States v. Boone,*
    245 F.3d 352 (4th Cir. 2001) ................................................ 22

*United States v. Brown,*
    635 F.2d 1207 (6th Cir. 1980) ........................................... 27, 28

*United States v. Brown,*
    3 F.3d 673 (3d Cir. 1993) ................................................... 12

*United States v. Brown,*
    303 F.3d 582 (5th Cir. 2002) ................................................ 37

*United States v. Brown,*
    631 F.3d 638 (3d Cir. 2011)................................................. 11

*United States v. Butts,*
    704 F.2d 701 (3d Cir. 1983).................................................. 21

*United States v. Caldwell,*
    518 F.3d 426 (6th Cir. 2008) ................................................. 5

*United States v. Carter,*
    756 F.2d 310 (3d Cir. 1985)................................................... 9

iv

*United States v. Christie,*
    624 F.3d 558 (3d Cir. 2010)...................................................... 24

*United States v. Conrad,*
    673 F.3d 728 (7th Cir. 2012) ................................................... 21

*United States v. Console,*
    13 F.3d 641 (3d Cir. 1993) ...................................................... 35

*United States v. Continental Group, Inc.,*
    603 F.2d 444 (3d Cir. 1979)..................................................... 31

*United States v. Citro,*
    842 F.2d 1149 (9th Cir. 1988) ................................................ 26

*United States v. DePeri,*
    778 F.2d 963 (3d Cir. 1986)..................................................... 31

*United States v. Driscoll,*
    852 F.2d 84 (3d Cir. 1988) ...................................................... 25

*United States v. Fattah,*
    858 F.3d 801 (3d Cir. 2017)..................................................... 24

*United States v. Frost,*
    999 F.2d 737 (3d Cir. 1993)..................................................... 11

*United States v. Gambino,*
    788 F.2d 938 (3d Cir. 1986)..................................................... 25

*United States v. Gambino,*
    926 F.2d 1355 (3d Cir. 1991)................................................... 31

*United States v. Gonzales,*
    927 F.2d 139 (3d Cir. 1991)..................................................... 25

*United States v. Harrison,*
    400 F. Supp. 2d 780 (E.D. Pa. 2005) ....................................... 9

*United States v. Hines,*
    628 F.3d 101 (3d Cir. 2010).................................................. 4, 8

*United States v. Hoffecker,*
    530 F.3d 137 (3d Cir. 2008)..................................................... 25

*United States v. Jannotti,*
   673 F.2d 578 (3d Cir. 1982)................................................................ 25, 28

*United States v. Jourdain,*
   Crim. No. 06-313, 2007 WL 269827 (D. Minn. Jan. 26, 2007)...................... 9

*United States v. Lakhani,*
   480 F.3d 171 (3d Cir. 2007)............................................................... 24, 29

*United States v. Maro,*
   272 F.3d (7th Cir. 2001) .................................................................... 10, 13

*United States v. Matlock,*
   415 U.S. 164 (1974) ........................................................................... 4, 5

*United States v. McGlory,*
   968 F.2d 309 (3d Cir. 1992).................................................................... 30

*United States v. Menendez,*
   Crim. No. 15-155, 2015 WL 5703195 (D.N.J. Sept. 28, 2015) ..................... 12

*United States v. Miknevich,*
   638 F.3d 178 (3d Cir. 2011)................................................................... 15

*United States v. Muhammad,*
   120 F.3d 688 (7th Cir. 1997) ................................................................. 37

*United States v. Murray,*
   821 F.3d 386 (3d Cir. 2016)............................................................... 4, 5, 6

*United States v. Nolan-Cooper,*
   155 F.3d 221 (3d Cir. 1998)........................................................ 24, 29, 30

*United States v. Padilla,*
   986 F. Supp. 163 (S.D.N.Y. 1997) ........................................................... 9

*United States v. Pavulak,*
   700 F.3d 651 (3d Cir. 2012).................................................................... 13

*United States v. Pitt,*
   193 F.3d 751 (3d Cir. 1999).................................................................... 24

*United States v. Ramos,*
   27 F.3d 65 (3d Cir. 1994) ....................................................................... 37

*United States v. Reed,*
   349 F.3d 457 (7th Cir. 2003) ................................................................. 22

*United States v. Reilly,*
   33 F.3d 1396 (3d Cir. 1994) ................................................................. 36

*United States v. Rodriguez,*
   414 F.3d 837 (8th Cir. 2005) ................................................................. 5

*United States v. Rosa,*
   891 F.2d 1063 (3d Cir. 1989) ................................................................. 33

*United States v. Rosario,*
   962 F.2d 733 (7th Cir. 1992) ................................................................. 6

*United States v. Solomonyan,*
   451 F. Supp. 2d 626 (S.D.N.Y. 2006) ........................................................ 40

*United States v. Starks,*
   515 F.2d 112 (3d Cir. 1975) ........................................................ 34, 35, 36

*United States v. Toler,*
   444 F. App'x 561 (3d Cir. 2011) ............................................................. 35

*United States v. Twigg,*
   588 F.2d 373 (3d Cir. 1978) ........................................................ 24, 25

*United States v. Ureste-Meza,*
   Crim. No. 12-96, 2012 WL 5334590 (M.D. Pa. Oct. 26, 2012) ..................... 35

*United States v. Vella,*
   562 F.2d 275 (3d Cir. 1977) ................................................................. 37

*United States v. Voigt,*
   89 F.3d 1050 (3d Cir. 1996) ................................................................. 25

*United States v. White,*
   34 F.3d 1075 (9th Cir. 1994) ................................................................. 6

*United States v. Wilson,*
   Crim. No. 15-521 (WHW), 2016 WL 3647327 (D.N.J. July 6, 2016) .............. 8

*United States v. Yusuf,*
   461 F.3d 374 (3d Cir. 2006) ........................................................... passim

*Utah v. Strieff,*
  136 S. Ct. 2056 (2016) .................................................................. 20, 21, 23

*Wilson v. Russo,*
  212 F.3d 781 (3d Cir. 2000)............................................................ 9, 10, 11

*Wong Sun v. United States,*
  371 U.S. 471 (1963) ................................................................................ 19

Defendant Nikolay Krechet has filed fifteen pretrial motions. The overwhelming majority of Krechet's motions have no merit, and, for the reasons set forth below, should be denied.

## BACKGROUND

The three-count Indictment alleges that, from at least as early as September 2014 through August 2015, Krechet and others conspired to transact in gift cards purchased with stolen credit card information, contrary to 18 U.S.C. § 2315, in violation of 18 U.S.C. § 371. Dkt. #1, Ct. 1 ("Indict."). The Indictment refers to these as "Stolen Gift Cards." Indict., Ct. 1, ¶ 1(d). Krechet purchased hundreds of Stolen Gift Cards, collectively worth thousands of dollars, in a series of transactions during the conspiracy. Two of those transactions are alleged as two substantive receipt of stolen property counts under § 2315, Counts Two and Three in the Indictment. Indict. at 7-8. Krechet purchased the Stolen Gift Cards from a cooperator, known as "E.R.," who took payment from Krechet in both cash and electronics. Indict., Ct. 1, ¶ 13(a) & (b). Krechet obtained the Stolen Gift Cards at a substantial discount, usually 20-to-22 percent below face value. The substantial discount reflected the risk that retailers would deactivate the Stolen Gift Cards if the fraud was detected in time, rendering them unusable. Indict., Ct. 1, ¶ 6.

Krechet was initially charged in a one-count complaint with wire fraud conspiracy, in violation of 18 U.S.C. § 1349, on May 28, 2015, *see* Brief in Support of Defendant Nikolay Krechet's Pretrial Motions ("Krechet Brief" or "KB"), Ex. 1 (the "Complaint"), and was arrested on June 2, 2015. Krechet was indicted

on February 18, 2016, on wire fraud conspiracy and substantive counts, in a case docketed as Crim. No. 16-64. That Indictment was dismissed, and Krechet was charged in the current Indictment on June 13, 2017. Trial is scheduled to commence on November 29, 2017, one day after jury selection.

## ARGUMENT

### I.    The Government Will Not Introduce Krechet's Uncounseled Statement in Its Case-In-Chief But Seeks Leave to Introduce It For Impeachment Purposes. (Response to Motion 1, KB5-10).

Krechet moves to suppress his uncounseled June 18, 2015 statement to FBI Special Agent Erin Brandt, in which he acknowledged that the gift cards seized from his hotel room likely were stolen property. The Government does not concede that the statement was taken in violation of *Miranda* and his right to counsel, in part because Krechet initiated the subject telephone call despite twice receiving *Miranda* warnings during his arrest and initial appearance. *See Jenkins v. Leonardo*, 991 F.2d 1033, 1037 (2d Cir. 1993). Nevertheless, the Government does not intend to introduce the statement in its case-in-chief. Krechet's motion is therefore moot.

Should Krechet testify at trial, however, his statement will become significant during cross-examination to show the falsity of his anticipated lack of knowledge defense. Krechet's statement was, in substance, that the gift cards seized from his hotel room would be "turned off" because they were "fraudulent or stolen." KB Ex. 2 at 2. If Krechet testifies contrary to that position in any

manner, then his statement is usable by the Government on cross-examination and in its rebuttal case if Krechet denies making the statement.

In *Kansas v. Ventris*, 556 U.S. 586 (2009), the Supreme Court found that a statement to an informant in violation of a defendant's Sixth Amendment rights under *Massiah v. United States*, 377 U.S. 201 (1964), was inadmissible in the state's case in chief, but usable to impeach the defendant if he took the stand. Statements taken without adequate *Miranda* warnings or in violation of the invocation of the right to counsel should not be usable by the government in their affirmative case, but this does not free the defendant to fabricate stories on the stand and pretend that he never took a contrary position. *See Ventris*, 556 U.S. at 593.

The Government respectfully submits that the statement Krechet made to Special Agent Brandt will impeach his anticipated lack of knowledge defense. The Government should, therefore, be entitled to inquire about the statement and then to prove up the statement should Krechet deny making it. The Government would accept a proper limiting instruction that the statement was being offered only to impeach Krechet and, therefore, goes only to his credibility.

## II.    The Court Should Deny Without a Hearing the Motion to Suppress Evidence Seized from the Hotel Room Because the Agents Clearly Had Valid Consent to Search It. (Response to Motion 2, KB10-12).

Krechet next moves to suppress gift cards and other evidence that law enforcement seized from Room 555 at the Sheraton Hotel in New Castle, Delaware, a hotel room that Krechet paid for but was not using when another

3

occupant, Nazur Mazurkevych, consented to the search. Although Krechet acknowledges that Mazurkevych was "an occupant of the hotel room," he maintains that the consent was invalid. KB 10.

Krechet is wrong. The Third Circuit's 2016 holding in *United States v. Murray*, 821 F.3d 386, 392 (3d Cir.), *cert. denied*, 137 S. Ct. 244 (2016), reaffirms that the name on a hotel reservation is not a license to nullify the consent of others legitimately present, and Krechet's supporting arguments, even if accepted, neither negate nor meaningfully controvert the agents' determination that Mazurkevych was authorized to permit the search. Indeed, in a two-hour post-arrest statement, Krechet, having voluntarily waived his right to counsel, supplied the agents with information in a post-arrest statement that they later relied upon in assessing Mazurkevych's authority to consent.

Accordingly, Krechet fails to "raise a specific, non-conjectural and detailed factual issue going to the validity of the search" and is not entitled to a hearing. *United States v. Hines*, 628 F.3d 101, 108 (3d Cir. 2010).

 "[T]he search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *United States v. Matlock*, 415 U.S. 164, 165-66 (1974). Permission to search, or enter, may be granted not only by the defendant, but also by any "third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171. Moreover, where the police make entry based on third-party consent, that entry

4

will be constitutionally "reasonable" for Fourth Amendment purposes not only where the third party had actual authority to authorize a search, but also where the third party had "apparent authority." Constitutionally reasonable "apparent authority" is present where "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quotation omitted).

Krechet's only objection to the search is that he—not Mazurkevych—rented the room. But the legitimacy of an occupant's authority to consent to search does not matter since that authority may be shared with others. *Matlock*, 415 U.S. at 171. Applying the rationale in *Murray*, "[t]he fact that the officers knew the room was registered to" Krechet does not render Mazurkevych's "consent invalid, because []he had common authority—or, at a minimum, apparent authority—over the room." 821 F.3d at 392; *see also United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008) (consent to search hotel room was valid when one co-occupant consented); *United States v. Rodriguez*, 414 F.3d 837, 844 (8th Cir. 2005) (consent to search motel room was valid when defendant's girlfriend consented, although defendant had registered and paid for the room). When Krechet rented the hotel room for "business" and gave Mazurkevych access to and control over the room to conduct that business, Krechet "assumed the risk that [Mazurkevych] could—and would—permit

others, including law enforcement, to enter the room when he was not present." *Murray*, 821 F.3d at 392.

Krechet acknowledges *Murray*, as he must, but fails to distinguish the holding in that case in any way. Indeed, the facts are remarkably similar. In *Murray*, the defendant rented a room for the prostitute who worked in it and who gave the authorities consent. 821 F.3d at 392. Krechet, likewise, admitted that "he rented the room for business," KB10, and, as reported in the FBI report, Mazurkevych subsequently told the agents that he worked with Krechet.

At the very least, Mazurkevych had apparent authority to consent to an entry by the agents. "To assess whether apparent authority exists, one must look for indicia of actual authority." *United States v. Rosario*, 962 F.2d 733, 737 (7th Cir. 1992). When dealing with a person at the door of a hotel or motel room, the critical question for the police is whether that person appears to be "vested with the power to allow whomever he pleased" into that room. *Id.* at 737. Indeed, courts have held that the mere fact of answering a motel room door manifests that the door opener "had control over the premises." *United States v. White*, 34 F.3d 1075, at *2 (9th Cir. 1994) (not precedential).

Here, by the time the agents received Mazurkevych's permission to enter Room 555, they had been told by Krechet himself that he had rented the room "for a year" and that "a lot of people" stayed there—as many as "20 people"—who were buying items "tax free" for Krechet using "gift cards" that he provided them.

Government Exhibit ("GX") 1-A.[1] When asked how so many individuals had access to the room, Krechet demonstrated that he was not concerned about who was using it: "[T]hey just give a key to this guy that guy or some other guy." GX 1-A. Krechet also admitted that he knew Mazurkevych and that he had asked Mazurkevych "to buy Apple products for me." GX 1-B. Then, when the agents visited the hotel room, Mazurkevych was there, along with another occupant who explained that he was working for Krechet as a "shopper." KB Ex. 5 at 1. When interviewed at the hotel, Mazurkevych confirmed that he worked with Krechet, who "sent him electronic Target gift cards which Mazurkevych used to purchase the iPads from Target." KB Ex. 5 at 1-2. Mazurkevych also verbally linked himself to the room, explaining that Krechet "order[ed] good[s] online" in Mazurkevych's name and had them "shipped to various addresses including . . . the hotel room." KB Ex. 5 at 1.

Thus, the agents—having been told by Krechet that as many as 20 people at a time had access to the hotel room, some of whom were conducting business on his behalf—encountered two individuals in the room who acknowledged working for Krechet. That alone is sufficient indicia of authority to consent. Perhaps more importantly, Krechet does not controvert *any* of these facts, let

---

[1] The Government has prepared draft transcripts of excerpts of Krechet's post-arrest statement, which are attached as GX 1. At the Court's request, the Government will provide the actual video recording of the statement. The Government provides the draft excerpts for the convenience of the Court and opposing counsel, and requests that their use be limited to the adjudication of these motions and for no other purpose, including trial.

alone argue that he affirmatively or constructively withheld or revoked Mazurkevych's authority to permit entry. His entire argument turns on the fact that he rented the room, a contention *Murray* rejected as legally insufficient to nullify the voluntary consent of another occupant. Based on the facts presented to them, the agents reasonably believed that Mazurkevych possessed common authority over room. Therefore, his consent to allow them into the room was valid.

Krechet raises no "issues of material fact that will affect the outcome" of his motion and does not present a "colorable constitutional claim" that the fruits of the consent search should be suppressed. *Hines*, 628 F.3d at 108. Accordingly, an evidentiary hearing is unnecessary. *See United States v. Wilson*, Crim. No. 15-521 (WHW), 2016 WL 3647327, at *5 (D.N.J. July 6, 2016).

**III.    Krechet Fails to Make the Requisite Substantial Preliminary Showing to Trigger a Hearing on the Validity of the Complaint and Search Warrant Affidavit. (Response to Motions 3 and 4, KB12-22).**

Krechet moves to suppress his post-arrest statements and the items seized incident to his arrest on the ground that his arrest was predicated on a materially untruthful complaint. KB12-21. Krechet also seeks suppression of data retrieved by agents during a search of his cellphone authorized by a search warrant predicated on the same supposedly erroneous statements. KB21-22. Krechet fails, however, to identify a material omission in either document or to support his barebones claim that the affiant deliberately or recklessly omitted relevant allegations. Krechet fails to make the requisite "substantial preliminary showing"

of a deliberate, material omission, and thus is not entitled to a veracity hearing (commonly known as a "*Franks* hearing"). Alternatively, assuming *arguendo* that the arresting agents lacked probable cause (which they plainly did not), Krechet's statement was attenuated from the allegedly unconstitutional law enforcement conduct and thus not subject to suppression.

## A.    Legal Standard

In *Franks v. Delaware*, the Supreme Court held that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant *if* the defendant can make the requisite preliminary showing. 438 U.S. 154, 155-56 (1978); *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006).[2] The Third Circuit has extended this right to permit challenges based on factual omissions from the warrant affidavit. *See Yusuf*, 461 F.3d at 383; *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000). The preliminary showing requirement is intended to "prevent the misuse of a veracity hearing for purposes of discovery or obstruction." *Franks*, 438 U.S. at 170-71.

To obtain a *Franks* hearing, the defendant must make a "substantial preliminary showing that (1) a false statement knowingly and intentionally, or

---

[2] Although *Franks* involved an allegedly fraudulent affidavit in support of a search warrant, courts have applied *Franks* to the evaluation of arrest warrants as well. *See, e.g.*, *United States v. Carter*, 756 F.2d 310, 313 (3d Cir. 1985) (applying the reasoning of *Franks* to arrest warrants); *United States v. Jourdain*, Crim. No. 06-313, 2007 WL 269827, at *15 (D. Minn. Jan. 26, 2007); *United States v. Harrison,* 400 F. Supp. 2d 780, 785-86 (E.D. Pa. 2005); *United States v. Padilla,* 986 F. Supp. 163, 168-69 (S.D.N.Y. 1997).

with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and (2) the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56; *Yusuf*, 461 F.3d at 383. To meet this threshold, the defendant must present more than conclusory statements that the affidavit contains false statements or omissions. *Franks*, 438 U.S. at 171; *Yusuf*, 461 F.3d at 383 n.8. The defendant must specifically identify allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument. *Franks*, 438 U.S. at 171. The defendant must also provide an offer of proof or give a satisfactory explanation for the absence of proof. *Id.* The "elements are hard to prove, and thus *Franks* hearings are rarely held." *United States v. Maro*, 272 F.3d at 817, 821 (7th Cir. 2001). In order to make the substantial preliminary showing, the defendant cannot rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must specifically identify the alleged false statements or omissions in the affidavit and present an offer of proof contradicting the affidavit. *Franks*, 438 U.S. at 171; *see also Yusef*, 461 F.3d at 383, n.8.

Statements or assertions contained in an affidavit of probable cause are "made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (quotations omitted). Omissions from an affidavit are made with reckless disregard for the truth when an officer withholds

10

facts that any reasonable person would know that a judge would want to know. *Wilson*, 212 F.3d at 783. A district court "may properly infer that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it." *United States v. Brown*, 631 F.3d 638, 649 (3d Cir. 2011). When attempting to demonstrate that the affiant included a false statement in a warrant affidavit or omitted a material fact from it, however, it is insufficient to prove that he acted with negligence or made an innocent mistake. *Franks*, 438 U.S. at 171; *Yusef*, 461 F.3d at 383.

Even if a defendant is able to make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, the defendant must then show that the offending information was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. If the offending information is excluded—or, in the case of an admission, included—and probable cause still remains, a *Franks* hearing is not required. *Id.*; *see also United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (reiterating the *Franks* test as a two-part test which requires the defendant to "show both bad faith or reckless disregard existed on the part of the affiant, and that there would have been no probable cause but for the incorrect statement.").

**B.    Krechet Fails to Demonstrate That the Affiant Made Intentional or Reckless Omissions, or That the Omissions Were Material.**

Although Krechet enumerates supposed material omissions in the Complaint, and the May 28, 2015 Search Warrant Affidavit signed by Magistrate Judge Pollak, E.D.N.Y. (KB Ex. 8) (the "Search Warrant Affidavit"), KB16-21, he fails to make a "substantial showing" (1) that the affiants on either document omitted facts intentionally or recklessly, or (2) that the omissions were material.

In order to make a preliminary showing on the first prong, a defendant must challenge the affiant's state of mind as well as the truth of the affidavit. *See Franks*, 438 U.S. at 155-56; *United States v. Brown*, 3 F.3d 673, 676-78 (3d Cir. 1993) (holding that a challenge to the truth of the affidavit was not sufficient for a *Franks* hearing where defendant offered no evidence that the affiant knowingly or recklessly gave false statements). A defendant, therefore, must make a preliminary showing not only of the falsity of the affidavit but also of the deliberate or reckless nature of the inaccuracy. *See United States v. Menendez*, Crim. No. 15-155, 2015 WL 5703195, at *10 (D.N.J. Sept. 28, 2015) (denying request for *Franks* hearing because defendant "fail[ed] to make a 'substantial showing' that [agent] falsified the description intentionally or recklessly").

Even if Krechet were able to satisfy the first prong (which he cannot), Krechet cannot demonstrate that any of the alleged omissions were material. At the second stage, the defendant must demonstrate that the omitted facts are "necessary to the finding of probable cause." *Yusuf*, 461 F.3d at 383-84. "[A]n

12

unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a Franks hearing." *Maro*, 272 F.3d at 821. Unless the allegedly omitted information materially undermined the affidavit's showing of probable cause, a *Franks* hearing is not required. *United States v. Pavulak*, 700 F.3d 651, 663 (3d Cir. 2012). Here, none of the alleged errors of omission identified by Krechet would have disturbed the probable cause determination if "introduced into the affidavit." *Yusuf*, 461 F. 3d at 388 n.12.

Krechet does not allege directly that either affiant intentionally or recklessly omitted factual allegations. He merely claims that material information was omitted from multiple paragraphs in the Complaint.[3] As the following rebuttal of Krechet's claims demonstrates, however, Krechet falls well short of making a substantial preliminary showing that Special Agent Brandt acted in reckless disregard for the truth or that any of the supposedly missing information—if supplied—would affect the probable cause determination.

*Knowledge:* Krechet argues that Special Agent Brandt failed to disclose that the FBI lacked evidence that Krechet knew that the gift cards were stolen property and that he knowingly conspired to obtain them. KB16-20 (addressing KB Ex. 1, Compl. ¶¶ 3(a)-(b), 4-8). But the FBI did have such evidence; the Complaint contained numerous factual allegations from which a reasonable fact-

---

[3] Krechet does not particularize any alleged omissions in the Search Warrant Affidavit.

finder could find probable cause to believe that Krechet acted with the requisite

*mens rea*, including that Krechet:

- obtained gift cards that had been purchased with stolen credit card data, *id.* ¶¶ 2, 3(a);

- obtained the gift cards "in bulk," *id.* ¶ 3(a);

- "on multiple occasions," purchased "hundreds of thousands of dollars' worth" of gift cards "at less than the face value," *id.* ¶ 3(b);

- paid $22,452 in cash and electronics for gift cards with a face value of $28,700—a more than 20% discount, *id.* ¶ 5;

- conducted business transactions for cash in his car, *id.*;

- paid $47,857 in electronics for gift cards with a face value of $60,750—a more than 20% discount, *id.* ¶ 6;

- paid $52,245, partly in cash, for gift cards with a face value of $66,250—a more than 20% discount, *id.* ¶ 8;

- agreed to buy gift cards from the cooperator even after acknowledging that gift cards that he had purchased from the cooperator "stopped working at one particular national retailer," *id.* ¶ 8;

- told the cooperator that one of his "associates had recently quit the conspiracy out of fear that he would end up in jail," *id.* ¶ 5; and

- requested and obtained from the cooperator a fraudulent invoice to deceive law enforcement and secure the release of two associates accused of transacting in stolen property, *id.* ¶¶ 9-17.

The Complaint not only set forth these facts but explained how they were

acquired. It explained that the cooperator described "Krechet's role in the

scheme" to law enforcement, and that this information was corroborated by

documentary evidence, text messages, and recorded calls and meetings. *Id.*

¶ 3(b). Krechet does not dispute the cooperator's credibility.

The detailed, sourced factual allegations in the Complaint did not admit to an omission on the issue of knowledge. "Determining the existence (or lack) of probable cause involves making a 'practical, common-sense decision' as to whether, given the totality of facts, a 'fair probability' exists that" the defendant committed the crime alleged. *United States v. Miknevich*, 638 F.3d 178, 184 (3d Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The facts set forth above, taken together, easily support an inference of probable cause that Krechet acted with the requisite knowledge. Krechet seems to insist upon more direct evidence of knowledge. But, "[a]bsent a confession," the probable cause determination for a *mens rea* crime "will always . . . rely on circumstantial evidence" of the suspect's state of mind. *Paff v. Kaltenbach,* 204 F.3d 425, 437 (3d Cir. 2000); *see also* 3d Cir. Model Crim. Jury Instr. § 5.01 ("state of mind can be proved indirectly from the surrounding circumstances"). Accordingly, Krechet fails to show that Special Agent Brandt acted intentionally or recklessly with respect to his knowledge because he fails to identify an omission.

*Legitimate Market:* Krechet next argues that the Complaint omitted reference to a legitimate marketplace for discounted gift cards. KB17-20 (addressing Compl. ¶¶ 3(c), 4-6, 8). Although the Government does not dispute that some businesses offer gift cards for purchase below their face value, disclosure of the existence of this market would have no bearing on the probable cause determination. Krechet bought heavily discounted cards from the cooperator for cash in an apartment and in a car, not in transactions reflective

of legitimate commerce. The cooperator, who explained Krechet's role in the illicit scheme to law enforcement, sold Krechet thousands of cards, all of them fraudulent, for thousands of dollars in cash and bartered electronics. Krechet cannot demonstrate that Special Agent Brandt recklessly omitted this entirely irrelevant information nor that its inclusion would nullify the probable cause determination. If anything, adding details about the existence of legitimate markets for discounted gift cards would have made Krechet's clandestine transactions all the more suspect. By Krechet's logic, a probable cause affidavit alleging off-label sales of scheduled narcotics would require reference to the existence of pharmacies where such narcotics are sold legally, which would only serve to underscore the illegality of the off-label transaction.

*Anti-Surveillance Measures:* Krechet next complains that Special Agent Brandt failed to explain why Krechet and the cooperator conducted the March 15, 2015 transaction in his vehicle and away from security cameras. *See* Compl. ¶ 5. According to Krechet, the cooperator told him that that they had to exit because his landlord did not want the cooperator doing business in his residence. KB18. Krechet contends that the omission left a misleading impression that he was concerned about surveillance, consistent with consciousness of guilt. He also complains that the Complaint omitted that Krechet and the cooperator previously had conducted transactions in the cooperator's apartment. Krechet fails, however, to demonstrate that Special Agent Brandt omitted this detail in bad faith. Nor would inclusion of the missing

16

detail nullify the probable cause finding. Rather, it would suggest that Krechet understood the cooperator to have an interest in avoiding attention and complied with his preference to conduct business outside. It does nothing to undermine the key allegations that Krechet repeatedly bought tens of thousands of dollars in stolen property from the cooperator in a series of informal, non-retail transactions.

*Non-Working Cards:* Krechet challenges paragraph 7 of the Complaint, which stated that Krechet discussed instances in which gift cards that he purchased from the cooperator did not work. KB19. According to Krechet, he raised the issue merely to get his money back, not because he suspected that the cards were fraudulent. KB19. He adds that he believed that the cooperator's gift cards were legitimate because only a small fraction them failed to work. KB19. Krechet cannot explain, however, how Special Agent Brandt could know Krechet's unvoiced thoughts on the matter. Accordingly, Krechet fails to demonstrate that the purported omissions were deliberately or recklessly excluded.

Krechet also challenges paragraph 8 of the Complaint, which reports that Krechet complained to the cooperator about a particular retailer where gift cards stopped working. KB20-21. He claims that he was complaining that the retailer put a daily limit on the value of gift card transactions. If included, this detail—which is supported only by Krechet's say-so—actually enhances rather than detracts from the probable cause analysis: Krechet churned so much business

17

in fraudulent gift cards that he admittedly bumped up against retailers' efforts to limit such fraud. In addition, Krechet offers no reason to believe that the affiant failed to offer this detail deliberately or recklessly.

*Apple Product Purchases:* Krechet next complains that Special Agent Brandt mischaracterized his remark to the cooperator that his associates had to avoid detection at Apple stores where they were purchasing iPhones. KB20 (addressing Compl. ¶ 7). Krechet explains that Apple limited the number of purchases per person for business reasons but his associates' attempts to circumvent the restrictions were not related to the alleged wire fraud conspiracy. Far from it. The dubious conduct of Krechet's business associates at Apple stores was part of the overall mix of information relevant to Krechet's involvement in the fraudulent gift card scheme. It is hardly reflective of legitimate enterprise to evade purchasing restrictions imposed by a major retailer. Adding that detail would not disturb the probable cause determination. Beyond that, Krechet again fails to explain why Special Agent Brandt would have reason to know the full context of Krechet's unvoiced thoughts.

*Fraudulent Invoice:* Finally, Krechet disputes the inclusion of paragraphs 9-17, which recount Krechet's role in supplying the fraudulent invoice to the Virginia authorities that arrested his associates on stolen property charges. KB21. He contends that the allegations are probative, at most, of his involvement in a conspiracy separate from that alleged in paragraphs 1 and 2 of the Complaint. KB21. Krechet contends that the inclusion of paragraphs 9-17 was

gratuitous. Following his logic, excising that material would have no effect on the remaining allegations, which Krechet insists involve a separate alleged conspiracy. Krechet thus fails to demonstrate a material impact that would justify a *Franks* hearing.

*    *    *

Krechet fails to satisfy the preliminary *Franks* standard on any of his challenges to the Complaint (and Search Warrant Affidavit) and is not entitled to a *Franks* hearing.

### C.    In the Alternative, the Post-Arrest Statement Was Properly Obtained.

Krechet alleges no basis for suppressing his post-arrest statements other than the arrest itself. Nor could he: Krechet received *Miranda* warnings and expressly waived his right to remain silent. GX 2 (FBI 302 of Investigation on June 2, 2015). Because Krechet gave those statements after he had been lawfully arrested, the arrest itself provides no basis for suppressing them. *See New York v. Harris*, 495 U.S. 14, 18 (1990) ("Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk."). After all, for evidence to be suppressed as "fruit of the poisonous tree[,]" there must in fact be a poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Here, there was no Fourth Amendment violation in Krechet's arrest, so no fruits of that arrest can be suppressed.

19

But even if Special Agent Brandt recklessly omitted material allegations in the Complaint—which she did not do and which the Government does not concede for the extensive reasons set forth above—at least Krechet's post-arrest statement should not be suppressed. The "significant costs of" the exclusionary rule means that it applies only "where its deterrence benefits outweigh its substantial social costs." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quotation marks omitted). "Suppression of evidence . . . has always been our last resort, not our first impulse." *Id.* Hence, under "the attenuation doctrine[,] evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' " *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

*Miranda* warnings alone do not render a confession free of the taint of an earlier Fourth Amendment violation under the attenuation doctrine. *Brown v. Illinois*, 422 U.S. 590, 603 (1975). Rather, to determine whether this causal connection is sufficiently attenuated, this Court must consider: (1) the temporal proximity between the unlawful conduct and the recovery of the evidence; (2) "the presence of intervening circumstances"; and (3) "particularly, the purpose and flagrancy" of the unlawfulness. *Id.* at 603-04; *see Strieff*, 136 S. Ct. at 2061-62 (discussing the *Brown* factors). The third factor is "particularly significant,"

given that "[t]he exclusionary rule exists to deter police misconduct." *Strieff*, 136 S. Ct. at 2062-63 (quotation omitted).

Here, the first factor only arguably favors suppression. The first factor favors attenuation when a "substantial time" elapses between the unconstitutional act and when the evidence is obtained. *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (*per curiam*); *see also United States v. Butts*, 704 F.2d 701, 705 (3d Cir. 1983) (confession not admissible when it occurred fewer than 4 hours after illegal arrest). Given the fact-intensive nature of the attenuation inquiry, however, there is no bright-line test for how much time must pass. *See Rawlings v. Kentucky*, 448 U.S. 98, 107-08 (1980) (forty-five minutes sufficient); *United States v. Conrad*, 673 F.3d 728, 733 (7th Cir. 2012) (two hours sufficient).

The circumstances of the arrest and interrogation suggest that, on balance, the approximately two hours that elapsed between the arrest and the beginning of Krechet's statement were sufficient to dissipate the taint of the (supposedly) unlawful arrest. Krechet was arrested "without incident" at approximately 8:35 p.m. in Brooklyn, New York. GX 3 (FBI 302 of June 2, 2015 Arrest). He received his *Miranda* warnings at the Newark FBI field office a little over two hours later, at approximately 10:48 p.m. GX 2. Krechet's waiver of his rights and post-arrest statement came after a relatively lengthy car ride from Brooklyn to Newark. *See Conrad*, 673 F.3d at 733 (factor favored attenuation, in part, based on "hour's car ride"). In addition, the video recording of the interview captures Krechet patiently listening to the agents' questions, providing at times

lengthy answers, and occasionally joking with the agents. Despite having one hand cuffed to the wall, Krechet appears relaxed, showing no signs of distress. This situational context helps the passage of time attenuate the underlying violation here. *See Rawlings*, 448 U.S. at 107-08 (explaining that "the precise conditions" of the detention—characterized by its "congenial atmosphere"—made up for the otherwise quantitatively "short" passage of time, thus permitting the time factor to weigh in favor of attenuation).

The second factor looks to whether any intervening circumstances have occurred that might "sever the causal connection between the illegal arrest and the discovery of the evidence." *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003). Although a *Miranda* warning is never alone sufficient to establish attenuation, *Taylor v. Alabama*, 457 U.S. 687, 690 (1982), it is nevertheless a relevant consideration. Here, Krechet received a *Miranda* warning, which he promptly waived. GX 2. He then gave a lengthy statement, during which he offered to "help" the agents and insisted that he didn't "think I really done much wrong." GX 1-C. *See United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001) (suggesting that factor favored attenuation, in part, because the defendant received his *Miranda* warnings, had intentionally cooperated to deflect suspicion away from him, and had engaged in "small talk" with officers). Krechet's decision to be cooperative was a tactical one that severed the connection between the arrest and his statements.

Finally, there is no indication of "purposeful or flagrant" misconduct. *Strieff*, 136 S. Ct. at 2063. "This was not a suspicionless fishing expedition 'in the hope that something would turn up.' " *Id.* at 2064 (quoting *Taylor*, 457 U.S. at 691); *contra Dunaway v. New York*, 442 U.S. 200, 218 (1979); *Brown*, 422 U.S. at 605. Kreceht's arrest was not "part of any systemic or recurrent police misconduct." *Strieff*, 136 S. Ct. at 2063. If the Court were to identify a defect in the Complaint, it would be, at worst, an aberration in an otherwise "bona fide investigation of" an ongoing Stolen Gift Card ring. *Id.* at 2063-64. But any theoretical "errors in judgment" here by Special Agent Brandt in drawing mistaken inferences based the investigation of Krechet "hardly rise to a purposeful or flagrant violation of" Krechet's "Fourth Amendment rights." *Id.* "For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* at 2064. Because that is all Krechet alleges here, suppression of his confession was not warranted. *Id.*

## IV.    The "Outrageous Government Conduct" Doctrine, If It Even Exists, Is Inapplicable Here. (Response to Motion 5, KB22-26)

Krechet next contends that his prosecution amounts to government misconduct so outrageous that it violates the Due Process Clause. His claim lacks both legal and factual merit. The Third Circuit has strongly suggested that the "outrageous government conduct" doctrine is a legal dead letter. Even if the doctrine does exist, courts routinely have rejected its application in cases involving comparable undercover investigations.

23

The Third Circuit has "repeatedly" noted that it is "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." *United States v. Christie*, 624 F.3d 558, 572-73 (3d Cir. 2010). "For the defense to apply, the Government's conduct must have rendered the prosecution of the defendant fundamentally unfair." *United States v. Lakhani*, 480 F.3d 171, 181 (3d Cir. 2007). Beyond that, "the government" must have "created the crime for the sole purpose of obtaining a conviction." *United States v. Pitt*, 193 F.3d 751, 759-60 (3d Cir. 1999). Thus, a court should not dismiss an indictment "each time the government acts deceptively or participates in a crime that it is investigating." *United States v. Nolan-Cooper*, 155 F.3d 221, 231 (3d Cir. 1998) (quotation marks omitted). Instead, "the challenged conduct must be shocking, outrageous, and clearly intolerable." *United States v. Barbosa*, 271 F.3d 438, 469 (3d Cir. 2001).

As the Third Circuit has recognized, "the viability of the doctrine is hanging by a thread" and it may be " 'moribund' " because, "in practice, courts have rejected its application with almost monotonous regularity." *Nolan-Cooper*, 155 F.3d at 230 (quotation marks omitted). Indeed, in 40 years, the Third Circuit has "granted relief on a claim of outrageous government misconduct only once" in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). *United States v. Fattah*, 858 F.3d 801, 813 (3d Cir. 2017). On *every* other occasion, this Court has rejected

the claim.[4] No wonder: even if *Twigg* remains good law, *see United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983) (*per curiam*); *United States v. Jannotti*, 673 F.2d 578, 610 n.17 (3d Cir. 1982) (*en banc*), it presented extraordinary circumstances.

In *Twigg*, "the government suggested that defendant join in establishing a methamphetamine laboratory and then supplied him with essential materials, equipment, technical expertise, and a site." *United States v. Driscoll*, 852 F.2d 84, 86 (3d Cir. 1988). Judging "this conduct in light of the fact that at the time the defendant 'was lawfully and peacefully minding his own affairs,' " this Court "concluded that 'fundamental fairness' " barred the prosecution. *Id.* (quoting *Twigg*, 588 F.2d at 381).

Nothing remotely comparable happened here. The Government did not concoct the conspiracy to ensnare Krechet but rather infiltrated it while it was already in progress. The Government did not hoodwink Krechet into committing criminal acts he was not otherwise predisposed to commit. Krechet transacted in stolen property long before law enforcement turned his confederate, and he continued to do so—in the same manner with the same people—when under surveillance. That the Government tolerated additional criminal conduct while it

---

[4] *E.g.*, *United States v. Hoffecker*, 530 F.3d 137, 152-56 (3d Cir. 2008); *United States v. Voigt*, 89 F.3d 1050, 1063-70 (3d Cir. 1996); *United States v. Gonzales*, 927 F.2d 139, 142-45 (3d Cir. 1991); *United States v. Gambino*, 788 F.2d 938, 945 n.6 (3d Cir. 1986).

collected evidence against Krechet and others is normal, not outrageous, and hardly supports dismissal.

Indeed, the Government's tactics here compare favorably to those in other undercover operations that did not violate Due Process. For example, in *United States v. Citro*, the government hired an informant "to act as a liaison in introducing undercover officers to merchants willing to accept counterfeit credit cards," "supplied all the counterfeit credit cards," and coaxed the "initially reluctant" defendant "to engage in the activity" after "an undercover police officer" bought him "two expensive dinners" "using counterfeit cards." 842 F.2d 1149, 1152 (9th Cir. 1988). Still, the Ninth Circuit rejected an outrageous government conduct defense, finding that the government "simply attempted to attach itself to an on-going . . . operation for the purpose of closing it down and prosecuting the operators." *Id.* at 1153 (quotation omitted). The Government did essentially the same here, the key difference being that Krechet exhibited absolutely no reluctance and required no wining and dining to continue transacting in stolen gift cards.

Nonetheless, relying on *Twigg* and a host of inapposite cases addressing far more shocking conduct, KB23-25, Krechet asks this Court to dismiss the indictment as the product of an investigation that violated Due Process. His reasons, however, neither individually nor collectively warrant the extraordinary remedy he seeks: dismissal of all charges against a key cog in a stolen property

ring who bought shopping bags full of gift cards at prices significantly below their face value.

*First*, Krechet claims that "the Government was complicit in aiding others to defraud consumers and financial institution[s] of in excess of $2 million" and should have "shut down" the "fraud well before" his victims sustained such losses. KB23. But, even setting aside Krechet's newfound concern for the victims of his fraud, undercover operations have exposed the public to far greater harm without violating Due Process.

In *United States v. Brown*, for example, an undercover agent accompanied members of a burglary ring to "approximately forty burglaries over seventeen months." 635 F.2d 1207, 1208-09 (6th Cir. 1980). The defendant claimed that "the danger of loss of property and the possibility of personal harm occasioned by the burglaries" made the investigation outrageous, particularly because, he argued, he should have been arrested after the first burglary. *Id.* at 1214. The Sixth Circuit rejected this argument, explaining that the "alternatives presented" to officials investigating "the criminal activity of individuals who are involved in a large criminal enterprise" are "exceedingly poor."

> They may arrest known criminals, thus ceasing their particular harmful effect on society; or they may allow them to continue in their violation of the law with the hope that further investigation will reveal a greater number of those involved in the criminal enterprise, the exposure and arrest of whom may effectively eliminate a much broader range and degree of criminal activity.

*Id.* Recognizing that "either alternative . . . would result in some harm to society," the court deferred to the government in choosing the alternative that "would result in the least amount of harm." *Id.*

The Third Circuit similarly has acknowledged that "[a] determination of what undercover operations are necessary to" identify and incapacitate the people willing to commit crime should "be left, in the first instance, to that branch of government which has the responsibility for maintenance of public order." *Jannotti*, 673 F.2d at 609. Thus, in this context, too, this Court "should not exercise a Chancellor's foot veto over law enforcement practices of which it [does] not approve." *Beverly*, 723 F.2d at 13 (quotation marks omitted). Rather, "the conduct of agents of the executive branch who must protect the public from crime" should be "considered through the political process where divergent views can be expressed in the ballot box." *Jannotti*, 673 F.2d at 609.

Here, unlike the active, risk-escalating role played by law enforcement in *Brown*, the Government infiltrated a stolen gift card enterprise downstream from where the harm to the public occurred. Krechet was buying gift cards that already had been purchased with stolen credit card information. In other words, the real harm to the public was done. The Government's investigation was directed at suppressing the downstream market for stolen property. It investigated dozens of individuals and made approximately seven arrests, some of which the Government could not have made had it moved swiftly to shut down the operation at the first confirmable instance of criminal conduct. This is

28

precisely the type of operation in which a defendant should not be permitted to second-guess the Government's decision about when and how best to accomplish its law enforcement objectives.

Second, Krechet claims that the investigation was outrageous because the Government "involved itself directly and continuously over such an extended period of time in the creation and maintenance of criminal operation between [E.R.] and Krechet." KB25-26. That is not the case. Krechet participated in the criminal enterprise with E.R. before the Government was involved. And it is for the jury to decide whether Krechet was complicit or, as he claims, merely "conducting his business in a way a reasonable law-abiding person would," unaware that the gift cards were stolen property. KB25. At the pretrial stage, Krechet cannot convert the central factual issue in this case into a basis for dismissal merely by proclaiming good faith.

Besides, the Government's role here was considerably less than in other cases rejecting the outrageous government conduct defense. See, e.g., Lakhani, 480 F.3d at 182 (government agent initiated illicit arms deal, and government was both buyer and seller of the arms); Nolan-Cooper, 155 F.3d at 224 (government agent wined, dined and had sex with target); Beverly, 723 F.2d at 11-13 (informant solicited defendants to burn down government-owned building, and government agent purchased gasoline, gasoline can and disguises for defendants and drove them to the building). It simply does not match the "quite

egregious" government "overinvolvement" in *Twigg*. *Nolan-Cooper*, 155 F.3d at 230.

Accordingly, the Court should decline to dismiss Krechet's charges.

## V.    Krechet Is Not Entitled to a Pretrial Hearing on Potential Co-Conspirator Statements. (Response to Motion 6, KB26-28).

Krechet requests a pretrial hearing to determine the admissibility of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). His request should be denied.

Pursuant to Rule 801(d)(2)(E), an out-of-court statement is admissible as non-hearsay where the Government demonstrates by a preponderance of the evidence that: (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant against whom the statement is offered were members of that conspiracy; and (3) the statement was made during the course, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987); *United States v. Bobb*, 471 F.3d 491, 498-99 (3d Cir. 2006). In making a factual determination on the admissibility of co-conspirator statements, the Court may consider the statements themselves as well as any other independent evidence of the conspiracy. *Bourjaily*, 483 U.S. at 180-81; *United States v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992).

The Third Circuit has never required district courts to conduct a pretrial hearing to determine whether a statement is admissible under Rule 801(d)(2)(E). Rather, the Third Circuit has explained that co-conspirator statements may be introduced at trial "without a prior showing of a conspiracy based on

independent evidence, subject to the requirement that the government make such a showing by the close of its case." *United States v. Ammar*, 714 F.2d 238, 246 (3d Cir. 1983); *see United States v. Gambino*, 926 F.2d 1355, 1360-61 (3d Cir. 1991) (affirming admission of statements subject to later connection to conspiracy); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1986) (same). The Court has explained that such a procedure accords with the district court's "control of the order of proof at trial," *United States v. Continental Group, Inc.*, 603 F.2d 444, 456 (3d Cir. 1979), and avoids "unduly complex and confusing" alternatives in cases involving "interrelated testimony" of a continuing conspiracy, *id.* at 457, and the need to hold lengthy and time-consuming mini-trials, *see Ammar*, 714 F.2d at 247; *see also Bourjaily*, 483 U.S. at 176 n.1 (refusing to opine as to whether ruling needed to be made before trial); *Gambino*, 926 F.2d at 1360-61.

Here, this Court should not hold a pretrial hearing, which would amount to precisely the sort of time-consuming mini-trial the Third Circuit has sought to avoid. The Government would be forced to present much of its case-in-chief to show that Krechet conspired with potential declarants and then duplicate it for the jury. It would also represent an undue windfall for Krechet, who would get a dress rehearsal of the Government's case.

Therefore, this Court should deny the request for a pretrial hearing, and, admit statements pursuant to Rule 801(d)(2)(E) at trial, if need be, subject to connection.

31

**VI.    Krechet's Baseless Motion About the Government's Proof That He Transacted in Fraudulently Obtained Gift Cards Should Be Denied. (Response to Motion 7, KB28-30).**

Krechet's next motion is rather unclear and entirely unsupported by authority. His apparent concern is being waylaid by "speculation" that any one of the more than $2 million in gift cards involved in the conspiracy was stolen property. He sets forth seven factual criteria that he contends the Government must satisfy to lay a proper foundation and avoid such speculation. KB29-30. He then claims that, if the Government cannot establish by competent proof "that a particular gift card was fraudulent and that it was redeemed by Krechet, then the Government should not be allowed to have any witness testify that Krechet purchased $2 million [] in fraudulent gift cards." KB30.

Krechet's confusing request should be denied for several reasons. *First,* Krechet offers absolutely no authority for his seven-part test for establishing that gift cards qualify as stolen property. While the Third Circuit lacks model instructions on 18 U.S.C. § 2315, a survey of instructions from other circuits demonstrates that the Government need prove only that subject property was "stolen" and that the defendant knew it. *See, e.g.*, 7th Cir. Model Crim. Jury Instr. § 2315[1]. The circuits do not specify *how* the government may establish property as "stolen." Nor must the Government prove that Krechet "redeemed" a particular card to prove it was stolen.

*Second*, to the extent Krechet complains about a lack of notice about particular gift cards, Krechet has not sought—and is not entitled to—a bill of

particulars about gift card evidence. As long as the indictment enables the defendant to understand the accusations against him and the central facts that the United States will present at trial, a bill of particulars is unwarranted. *See United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989). Krechet has received extensive Rule 16 discovery. Where, as here, "discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines." *United States v. Caruso*, 948 F. Supp. 382, 393 (D.N.J. 1996); *see also United States v. Atwell*, Crim. No. 13-560, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015) (Wolfson, J.) ("discovery, combined with the sufficiency of the allegations contained in the Superseding Indictment, negates the need for a bill of particulars"). Indeed, Krechet has yet to receive the Government's exhibit list, which might well shed light on which—if any—cards (in addition to those involved with the substantive counts) the Government intends to prove up at trial.

*Third*, Krechet offers no reason to suppose that the Government would offer something less than competent evidence to establish beyond a reasonable doubt that a particular gift card transacted during the conspiracy constitutes stolen property. At base, Krechet's motion is nothing more than a request that the Government adhere to the Federal Rules of Evidence. If—at trial—Krechet believes the Government has failed to lay a proper foundation, he can object. And he can argue to the jury that the Government has failed to meet its

evidentiary burden. But the law does not permit Krechet to contour the Government's proofs in the manner he claims.

**VII. Krechet's Blanket Authenticity and Chain of Custody Challenges Are Premature and Do Not Conform to the Court's Order. (Response to Motions 8 and 9, KB30-31).**

Krechet objects to the authenticity and chain of custody of all Government exhibits and leaves the Government "to its burden" of authenticating trial exhibits. Krechet's blanket assertion of an authenticity objection is both premature and contrary to the procedure set forth in the Court's July 25, 2017 Scheduling Order. *See* Dkt. #11. The Court's Order directs Krechet to notice objections to "an exhibit" on or before November 6, 2017, along "with a statement delineating why the authenticity [and] chain of custody . . . is being challenged." *Id.* ¶ 6(c). With the Government's exhibit list not due until October 30, 2017, Krechet is objecting to records that the Government has yet to notice as exhibits. Although the Government will bear the burden of establishing authenticity and chain of custody at trial, the Court's pretrial procedures require advance notice of particular objections to specific exhibits. Krechet's blanket objections do not meet this requirement.

**VIII. A *Starks* Hearing Is Unwarranted Because Krechet Has Not Made a Colorable Attack on the Authenticity or Accuracy of Any Recording. (Response to Motion 10, KB31-32).**

Krechet requests a hearing pursuant to *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975), to assess the authenticity and audibility of recordings before their admission at trial. Courts in this Circuit have questioned *Starks'*

34

continuing viability in light of the intervening adoption of the Federal Rules of Evidence. But even if *Starks* remains good law, Krechet's blanket opposition to unspecified recordings falls well short of the threshold for triggering the hearing he requests.

*Starks* held that, when the government seeks to admit recordings into evidence, it bears the burden of establishing their authenticity and accuracy by clear and convincing evidence. 515 F.2d at 121. But *Starks* was decided prior to the enactment of Rule 901, which provides that in order to be admissible, evidence must be authenticated or identified "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a).

In light of Rule 901(a), *Starks'* higher "clear and convincing evidence requirement" may no longer apply. *See United States v. Ureste-Meza*, Crim. No. 12-96, 2012 WL 5334590, at *5 (M.D. Pa. Oct. 26, 2012) (listing cases addressing conflict between *Starks* and Rule 901). The Third Circuit has found that it "need not comment on the relationship between *Starks* and Rule 901," as the Government satisfied the higher *Starks* standard. *United States v. Toler*, 444 F. App'x 561, 564 n. 4 (3d Cir. 2011); *see also United States v. Console*, 13 F.3d 641, 660-61 (3d Cir. 1993) (applying Rule 901(a), without mentioning *Starks*, to determine whether a telephone recording was properly authenticated). The Third Circuit has also described the government's burden under Rule 901(a) as "slight" and requiring "only a prima facie showing . . . of authenticity, not a full argument

on admissibility." *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994) (quotation omitted). By dispatching with the requirement of "a full argument on admissibility," Rule 901(a) diminishes the need for the authenticity hearing that Krechet demands.

Even if *Starks* remains good law, Krechet fails to mount the sort of "colorable attack" on the authenticity and accuracy of a recording that *Starks* requires before shifting the burden to the government. *Starks*, 515 F.2d at 122. Krechet challenges no specific portions of recordings and, indeed, fails to identify any particular recordings at all. As Krechet has presented nothing more than a request for hearing, he has not made a "colorable attack" and no hearing is warranted at this time.

## IX. Krechet's Motion That the United States Preserve Its "Rough Notes," "Report Drafts," and "Final Reports" Is Moot, Because the United States Has and Will Continue to Preserve Such Documents. (Response to Motion 11, KB32-33).

Krechet asks the Court to compel the Government to preserve all "rough notes, report drafts, and final reports that were prepared by Government agents or witnesses" in this case.

The federal prosecutors and law enforcement agents who comprise the prosecution team in this case are all aware of and have complied with their obligations under *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983), to preserve notes of interviews and handwritten drafts of reports. The prosecutors will review the rough notes to determine whether they contain any material impeachment information. The United States is not required to disclose those

materials to the defense on demand. *See United States v. Brown*, 303 F.3d 582, 590 (5th Cir. 2002); *United States v. Muhammad*, 120 F.3d 688, 699 (7th Cir. 1997). Rather, if so directed by the Court, the United States will submit those materials to the Court for *in camera* review and possible disclosure to Defendants. *See United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1977) (notes should be kept so that the trial court can determine whether they should be made available to the defendant); *accord United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994).

## X.  Krechet's Request for Jencks Disclosures Is Mooted by the Scheduling Order. (Response to Motion 12, KB33-34).

Krechet claims that the early production of material covered by the Jencks Act, 18 U.S.C. § 3500, is necessary "to expedite the trial and avoid unnecessary delays." KB33-34. As a statutory matter, the Government has no obligation to produce Jencks material until a witness has testified. 18 U.S.C. § 3500. Of course, the Government will abide by the Court's directive in the Scheduling Order, which provides for Jencks disclosures on or before November 20, 2017. Dkt. #11, ¶ 13. That schedule will ensure that Krechet has sufficient time to prepare for cross-examination, particularly because the Government already has provided extensive discovery materials to Krechet in this case, including a considerable amount of material that qualifies as Jencks.[5]

---

[5] The second paragraph of Krechet's Jencks demand seeks the immediate turnover of "Jencks or impeachment materials relating to any person." KB34. It is not clear to the Government how these "materials" differ from the materials sought in the previous paragraph nor how the "conspiracy charges" to which

Of course, Krechet has a reciprocal duty to produce to the Government prior statements of his witnesses, *see* Fed. R. Crim. P. 26.2, and the Government has reminded counsel of this obligation in its discovery letters. So far, nothing has been received from Krechet. In light of the Government's willingness to produce Jencks material prior to the testimony of its witnesses, the Government requests that the Court direct counsel to provide "reverse Jencks" material on or before November 20, 2017, as the Court's Scheduling Order requires. Dkt. #11, ¶ 14.

## XI. Krechet's Request for Transcripts of Recorded Conversations Ten Days Before Trial Should Be Rejected. (Response to Motion 13, KB34).

Without citing a single authority, Krechet asserts that "[i]n all fairness to the defendant, the government should be required" to hand over transcripts of all recorded conversations ten days before trial. Such an unheard-of procedure, according to Krechet, will give him "an adequate opportunity to prepare for this complex trial." KB34.

Krechet cites no authority because there is no authority for such a request. Rule 16 states that "the government must disclose to the defendant, and make available for inspection, copying, or photographing . . . any relevant . . . recorded statement by the defendant if: the statement is within the government's possession, custody, or control; and the attorney for the

---

Krechet refers affect the disclosure analysis. It suffices to say, however, that the Government will comply with the deadlines for Jencks set forth in the Scheduling Order.

government knows—or through due diligence could know—that the statement exists." Fed. R. Crim. P. 16(a)(1)(B)(I). The Government has scrupulously complied with—indeed, exceeded—the requirements of the Rule, by providing all recordings to Krechet, on disc. The Government also has extended Krechet the courtesy of providing draft transcripts and translations to Krechet's counsel pursuant to stipulation. If Krechet opts not to rely for trial preparation on the draft transcripts to which he stipulated, he is free to make his own versions.

Krechet does not—because he cannot—point to any rule or authority that requires the Government to provide him with any transcripts of his recorded statements, even one day before trial, much less to designate "final" versions of such transcripts. Nevertheless, the Government will provide Krechet with the versions of transcripts that the Government anticipates using at trial as they become ready. His motion should be denied.

## XII. Krechet's Request for the Identification of and a Pretrial Hearing on Rule 404(b) Evidence Is Premature. (Response to Motion 14, KB34-35).

Krechet asks the Court for a preliminary hearing on all evidence that the Government intends to offer at trial pursuant to Rule 404(b). The Government acknowledges its obligation to make pre-trial disclosure of such information, and will do so in accordance with the Court's Scheduling Order, which directs disclosure on or before November 13, 2017. The request for a hearing is premature, particularly because Government has not yet decided what evidence

[it] will seek to introduce. *Cf. United States v. Solomonyan*, 451 F. Supp. 2d 626, 646 (S.D.N.Y. 2006).

## XIII. Krechet May Make Additional Motions Based on Information Unknown to Him Prior to the Deadline Previously Established by This Court. (Response to Motion 15, KB35-36).

Krechet has moved for permission to leave to file unspecified pretrial motions in the future. The Government does not oppose this request, recognizing that circumstances may arise that would make it appropriate and necessary for additional motions to be filed by both Krechet and the Government in the future (in addition to the motions *in limine*, which are due November 13, 2017, *see* Dkt. #11, ¶ 12(a)). However, Krechet should not be permitted simply to enlarge the time for filing of motions that could and should have been brought based on discovery materials provided long ago. It would be unfair to require the Government, which has now begun trial preparation, to respond on the eve of trial to belated defense motions that could have been filed earlier.

**CONCLUSION**

For all of the reasons set forth above, the Government submits that the Court should deny Krechet's pre-trial motions.

Respectfully submitted,

WILLIAM E. FITZPATRICK
Acting United States Attorney
970 Broad Street, Room 700
Newark, New Jersey 07102
(973) 645-2742


    /s/ *Andrew J. Bruck*
By:    Andrew J. Bruck
    Assistant U.S. Attorney


    /s/ *David W. Feder*
By:    David W. Feder
    Assistant U.S. Attorney

Dated:    Newark, New Jersey
    October 11, 2017

41

EXHIBIT 1

<u>**Government Exhibit 1-A**</u>

**Transcript of Nikolay Krechet's Post-Arrest Statement – June 2, 2015**

<u>**Participants**</u>

Nikolay Krechet          Defendant

Erin Brandt              FBI Special Agent

<u>**Excerpt - Time: 1:17:31 – 1:20:35**</u>

| | |
|---|---|
| SA BRANDT: | Okay. So Roman lives in New Castle? Do you know where he lives in New Castle? |
| N. KRECHET: | Um, I think he (UI) time at Sheraton. |
| SA BRANDT: | Sheraton? |
| N. KRECHET: | Yeah. |
| SA BRANDT: | Hotel? |
| N. KRECHET: | Yeah. |
| SA BRANDT: | Do you know what room? |
| N. KRECHET: | [blows air]. |
| SA BRANDT: | Is that the room registered to you? |
| N. KRECHET: | Yeah. |
| SA BRANDT: | Okay, so it's your room. |
| N. KRECHET: | Yup. |
| SA BRANDT: | Okay. What do you have a room at the Sheraton Hotel for? |
| N. KRECHET: | I spend time, a lot of time there. |
| SA BRANDT: | A lot of time in Delaware. How long do you have that room rented for? |
| N. KRECHET: | Since February. |
| SA BRANDT: | Since February? For a year? |
| N. KRECHET: | Yeah. |
| SA BRANDT: | Okay. So who else besides Roman stays there? |

| | |
|---|---|
| N. KRECHET: | Oh, lot of people. |
| SA BRANDT: | Okay, what are their names? |
| N. KRECHET: | Lisa. Elizabeth. Gregory. Most people from hotels, they stay there as well. 20 people sometimes. |
| SA BRANDT: | 20 People? |
| N. KRECHET: | Yeah. |
| SA BRANDT: | And why do they stay at that hotel? |
| N. KRECHET: | 'Cause they just give a key to this guy that guy or some other guy. |
| SA BRANDT: | Okay so they, but what's there purpose for being in Delaware? |
| N. KRECHET: | Ahh, buy tax free. |
| SA BRANDT: | Buy tax free? |
| N. KRECHET: | Yeah. |
| SA BRANDT: | Christiana Mall? |
| N. KRECHET: | Uh-huh. |
| SA BRANDT: | For you, for you, or for themselves? |
| N. KRECHET: | For themselves. |
| SA BRANDT: | For themselves? |
| N. KRECHET: | And for me. |
| SA BRANDT: | And for you. |
| N. KRECHET: | And for themselves. |
| SA BRANDT: | Okay. So you're not giving them a free room out of the goodness of your heart? |
| N. KRECHET: | Ahh. |
| SA BRANDT: | And that's a nice room, right? It's a suite. |
| N. KRECHET: | Yeah, because I have to pay (UI) the hotel a $100.00 a day. So it's like 50 percent of the . . . |
| SA BRANDT: | Okay. |

2

N. KRECHET:        Also for bonuses, it goes $80.00. It it includes breakfast and lunch, so, it's a good deal.

SA BRANDT:         Okay that is a good deal, that (UI).

N. KRECHET:        And many people pay me the money back.

SA BRANDT:         For the hotel?

N. KRECHET:        Yeah.

SA BRANDT:         Okay, so they're not just staying there?

N. KRECHET:        Right.

SA BRANDT:         Okay. So the business that they are doing at Christiana Mall for you, so I understand—

N. KRECHET:        For me or for themselves.

SA BRANDT:         Themselves and for you. But we're gonna to focus on, since you're here right now we're going to talk their business for you.

N. KRECHET:        Yes.

SA BRANDT:         What business do you direct them to do at the Christiana Mall?

N. KRECHET:        Buying iPhones.

SA BRANDT:         Just buying iPhones?

N. KRECHET:        iPhones and iPads.

SA BRANDT:         Do you give them, do you provide them with gift cards or money?

N. KRECHET:        Gift cards

SA BRANDT:         Gift cards?

N. KRECHET:        Gift cards or money.

SA BRANDT:         Okay and then you give them a list of what—

N. KRECHET:        Yeah, but mostly I buy.

SA BRANDT:         Mostly you buy?

N. KRECHET:        Yup.

3

SA BRANDT:              But sometimes they do.

N. KRECHET:             Yup, but all the people do.

## <u>Government Exhibit 1-B</u>

### <u>Transcript of Nikolay Krechet's Post-Arrest Statement – June 2, 2015</u>

<u>**Participants**</u>

Nikolay Krechet          Defendant

Erin Brandt              FBI Special Agent

<u>**Excerpt - Time: 44:22 – 45:35**</u>

*Krechet is shown photograph.*

| | |
|---|---|
| SA BRANDT: | Alrighty. |
| N. KRECHET: | That's Nazar. |
| SA BRANDT: | And when did you meet Nazar? |
| N. KRECHET: | That's . . . Max . . . one of the guys I was thinking about? I mentioned his name actually. |
| SA BRANDT: | Yeah right with Max. |
| N. KRECHET: | Yup. |
| SA BRANDT: | When did Max introduce you? |
| N. KRECHET: | 2 years ago. |
| SA BRANDT: | Okay. And what's your relationship with him? |
| N. KRECHET: | He was picking up like Apple products a few times. |
| SA BRANDT: | Okay. |
| N. KRECHET: | Yeah. But he worked for . . . maybe he worked for other guys. I don't know. |
| SA BRANDT: | Okay. |
| N. KRECHET: | I paid him a few times, and, but no . . . But I saw him, I mean, independently a few times, he was buying from other people, I think, but I'm not sure. |
| SA BRANDT: | Okay. Alright, and so did he buy from you or for you? |
| N. KRECHET: | For me. I asked him to buy Apple products for me. |
| SA BRANDT: | Okay. |

N. KRECHET:          But I think he mostly do it for himself or some other
                     guys.

SA BRANDT:           And then when he or anybody else buy Apple products
                     for you do they bring them back to you or do they sell
                     them for you also?

N. KRECHET:          No just pick up and I pay a few dollars, and that's it.

SA BRANDT:           Okay.

<u>**Government Exhibit 1-C**</u>

**Transcript of Nikolay Krechet's Post-Arrest Statement – June 2, 2015**

<u>**Participants**</u>

Nikolay Krechet           Defendant

Erin Brandt               FBI Special Agent

<u>**Excerpt - Time: 1:00:31 – 45:35**</u>

| | |
|---|---|
| N. KRECHET: | Yup. I mean, what I'm saying, I mean, if there is, I want to get out of here so, I have one boy, I have— |
| SA BRANDT: | Right. Well you're not getting out tonight. |
| N. KRECHET: | I understand. |
| SA BRANDT: | Yeah. |
| N. KRECHET: | Yeah, so If there is any help I can give. I have (UI)— |
| SA BRANDT: | Okay.  That's great. |
| N. KRECHET: | I don't think I really done much wrong so. |
| SA BRANDT: | Okay.  That's why we're gonna go though stuff. We have a few more things we are going to talk about and then, we'll figure out what we're doing for the night. |

EXHIBIT 2

Nikolay Serial 74

- 1 of 1 -

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    06/04/2015

On 6/2/2015, Nikolay Krechet was interviewed following his arrest by SA Erin Brandt and USSS SA Christopher Reyes at the Newark FBI Office located at 11 Centre Place, Newark, NJ.

At approximately 10:48pm, Krechet was read his advice of rights and consented to waive his rights. Krechet was subsequently interviewed by SA's Brand and Reyes. During the interview, Krechet was provided with water and was allowed to use the bathroom. Krechet was also allowed to conduct supervised telephone calls with his wife E█████ N██████████.

The interview was recorded.

The signed advice of rights is contained in the associated 1A.

---

Investigation on  06/02/2015  at  Newark, New Jersey, United States (In Person)

File # ████████████████████    Date drafted  06/04/2015

by  BRANDT ERIN MICHELLE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT 3

Nikolay Serial 75

FD-302 (Rev. 5-8-10)

- 1 of 1 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    06/04/2015

     Pursuant to an authorized arrest warrant signed by the Honorable Mark Falk, United States District Court, District of New Jersey, Newark, New Jersey, Special Agents of the Federal Bureau of Investigation and the United States Secret Service (USSS), and United States Postal Investigators located and arrested Nikolay Krechet at vehicle, 2014 silver-colored Toyota Camry, bearing Pensylvania license plate number ▮▮▮▮, located outside of 2555 E 12 St., Brooklyn, NY.

     Krechet was arrested at approximately 8:35 p.m. on 6/2/2015 without incident. Following the arrest, Krechet was transported from Brooklyn, NY to the Newark office of the FBI, 11 Centre Place, Newark, New Jersey. SSA Edgar Koby and SA Erin Brandt transported Krechet.

     The following agents participated in the arrest: SSA Edgar Koby, SA Ronald Pascale, SA Erin Brandt, SA Laura Tuteral, SA Erik Urban, TFO Robert Hruska, USSS SA Christopher Reyes, and USPI Thomas Oertel.

---

Investigation on   06/02/2015   at   Newark, New Jersey, United States (In Person)

File #   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Date drafted   06/04/2015

by   BRANDT ERIN MICHELLE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.